ROBERT J. JONKER, CHIEF UNITED STATES DISTRICT JUDGE
Plaintiff John Mbawe is a former student of Ferris State University's College of Pharmacy ("pharmacy program"). During his third year, he began making paranoid and delusional statements claiming he was being poisoned. A State probate court ultimately entered an order involuntarily *945 committing Plaintiff for mental health treatment. The order was never appealed or vacated. After Plaintiff's commitment, Defendants withdrew Plaintiff from the pharmacy program. Readmission remained a possibility, but Plaintiff did not complete the Michigan Health Professionals Recovery Program ("HPRP"), a non-disciplinary program designed to assist participants recover from substance abuse or mental health problems, as a condition of readmission.
Plaintiff brought this disability discrimination action against Defendants on September 30, 2016, alleging statutory violations under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, et seq. , and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. , as well as constitutional violations under 42 U.S.C. § 1983 for substantive and procedural due process right violations.[1] The matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 61 ). Plaintiff has responded to the motion, and Defendants have replied. (ECF Nos. 69; 77). After careful review of the record, the Court considers oral argument unnecessary to resolve the matter. Plaintiff's claims under the ADA and Rehabilitation Act fail because Plaintiff cannot show he was "otherwise qualified" to continue in the pharmacy program. Plaintiff's Due Process claims fail because his allegations do not amount to a violation of his substantive due process rights and Plaintiff received adequate procedural process. Accordingly, Defendants' Motion for Summary Judgment will be GRANTED.
BACKGROUND
I. Plaintiff's Enrollment in the Pharmacy Program
Plaintiff registered as a student in the pharmacy program in 2010. (ECF No. 1, PageID.4). The program ordinarily consists of three years of academic instruction in a classroom setting, followed by a one-year internship. (Id. ). Plaintiff avers he entered the program on a remedial track that afforded him an additional year within which he could complete his academic instruction. (ECF No. 59, PageID.1417).
When Plaintiff enrolled, he signed a document entitled "Technical Standards for Students Admitted to The Doctor of Pharmacy Degree Program." (ECF Nos. 58-33; 69-1). The document stated that each student in the pharmacy program must be able to demonstrate proficiency in the listed skills, with or without reasonable accommodation, and the pharmacy program reserved the right to dismiss an admitted student who fell out of compliance with the Technical Standards. (Id. ). Furthermore, because of the internship component, the Technical Standards required all students in the pharmacy program to maintain an educational "Pharmacist Intern license" that is issued by the State of Michigan.[2] (Id. ). The license is also required by Michigan law. See MICH. COMP. LAWS § 333.17737(2). Plaintiff received his limited educational license on July 14, 2010. (ECF No. 1, PageID.4). The license was suspended in the wake of Plaintiff's involuntary commitment.
Plaintiff struggled in his coursework from the beginning of his time in the program. In fact, when Plaintiff failed to *946 achieve a GPA of 2.0 after his first year, he was academically dismissed from the pharmacy program. Plaintiff successfully appealed his dismissal, however, and he was reinstated with a number of conditions. (Pl.'s Dep. at 9-13, ECF No. 58-2, PageID.990). Plaintiff managed to stay above the GPA threshold through the 2012-2013 academic year, however during the summer of 2013, if not before, Plaintiff began exhibiting a troubling pattern of behavior that Defendants believed demonstrated delusional and paranoid thinking. A state court agreed, and ordered Plaintiff's involuntary commitment after reviewing the recommendation of two independent physicians, as required by Michigan law. After the involuntary commitment, Plaintiff did not gain readmission to the program.
II. Plaintiff Tells Others He is Being Poisoned and Program Administrators Become Aware of Plaintiff's Mental Health Issues
Over the summer of 2013, Plaintiff treated with healthcare professionals at the university's Birkam Health Center ("BHC") for an idiopathic medical condition causing severe abdominal pain. (ECF No. 1, PageID.4). During some of these visits, Plaintiff told BHC health professionals that he believed he was being bullied by a group of people. He thought the group put some sort of liquid on his car and on his left arm, which caused his skin to darken. Plaintiff also thought someone had broken into his apartment and poisoned his food. (ECF No. 1, PageID.5). Plaintiff says he told some of the pharmacy program staff that he was concerned for his own health. (ECF No. 59-26, PageID.1845). Defendants contend this was neither the first time nor the last time Plaintiff demonstrated paranoid behavior.[3]
Once the fall 2013 semester began, Plaintiff began missing his classes. Plaintiff's instructors thought Plaintiff was confused about his class schedule and course requirements. Plaintiff also told one of his professors he was being injected with drugs while he slept. (ECF No. 58-23, PageID.1195). Reports expressing concern about Plaintiff eventually made their way to the pharmacy program's student services coordinator, Defendant Jeffrey Bates, who says he spoke to Plaintiff about these concerns on several occasions. During these conversations Plaintiff continued to claim he was being injected with needles while he slept. (Id. ). Troubled by these statements, and by the earlier reports, Defendant Bates sent two e-mails, dated September 16 and 18, 2013, to Plaintiff's professors. Defendant Bates wrote that Plaintiff had "some serious health issues going on" and that Defendant Bates had discussed those issues with Plaintiff's physician. (ECF No. 1, PageID.5-6).
Meanwhile, at the beginning of the fall semester Plaintiff learned his brother had passed away. Plaintiff requested a week long excused absence in order to travel home to Africa to attend his brother's funeral, but Plaintiff ultimately decided not to make the trip. (ECF No. 1, PageID.6).
*947 Even though Plaintiff did not make the trip, Defendants argue these plans are important because they link Plaintiff to notes on three scraps of paper found in a university restroom on September 16, 2013. The scraps of paper allegedly contain Plaintiff's hand-written notes and contain remarks about flight plans and statements indicating Plaintiff believed he was in danger and was being injected.[4] Specifically the notes state that Plaintiff believed unspecified individuals were sent to "stick" him at night, and that he believed "they are killing me for nothing," and "I know I will die for what they have on my body." The notes also expressed a belief that there were cameras in the Plaintiff's apartment, and that Plaintiff's food was being poisoned. (ECF No. 1, PageID.6; ECF No. 24-1, PageID.257). Plaintiff further pled for someone to rescue him because he knew there were "good people in America." (Id. ).
On September 19, 2013, Plaintiff missed a scheduled appointment with Dr. Susan Davis, his primary care physician at BHC. Defendants have submitted Dr. Davis' note from the canceled visit. In the note, Dr. Davis wrote that Defendant Bates called the doctor to discuss the notes that had been found in the bathroom and Defendant Bates attributed the notes to Plaintiff. Dr. Davis' note states the clinic was attempting to reach Plaintiff, and that the doctor had diagnosed Plaintiff with an altered mental status. (ECF No. 58-16, PageID.1160). Plaintiff was eventually reached later that day and seen at BHC by Nurse Melissa Sprague. Plaintiff told the nurse he had recently lost his brother and was not feeling well. The nurse's treatment note reports that Plaintiff made comments similar to those contained on the slips of paper. Specifically, Plaintiff "claim[ed] that people [were] coming into his apartment and poisoning his food and injecting thinks [sic] into his body." (ECF No. 59-11, PageID.1648). Nurse Sprague's assessment was that Plaintiff had a mental disorder, though she did not find Plaintiff's behavior threatening or bizarre. (Id. ) Plaintiff gave permission for BHC staff to talk to Defendant Bates, and Nurse Cande Price made the call. Despite the statements Plaintiff had made, Ms. Price reported Plaintiff was "rational and is unwilling to see a psychiatrist" and that Plaintiff was not a threat either to himself or to others. (ECF No. 59-11, PageID.1649).
Dr. Davis testified during her deposition that she agreed with Nurse Price that Plaintiff did not pose a threat. (ECF No. 59-14, PageID.1695). Plaintiff argues, however, that his professors were pressuring the doctor and demanding that Plaintiff see the school psychologist. Dr. Davis thus encouraged Plaintiff to see a psychiatrist to prove his professors wrong and take the pressure off her. (ECF No. 59-26, PageID.1845). Plaintiff agreed, and on September 20, 2013, Plaintiff met with Mr. Thomas Liszewski, MA, LLP, LPC, for an assessment.
Plaintiff's presenting problem was described as being "[d]elusional," though the initial intake found Plaintiff was oriented to all spheres. Plaintiff's risk assessment was also "low" and Mr. Liszewski wrote Plaintiff seemed "quite friendly and rational." (ECF No. 59-11, PageID.1650). But during the examination, Plaintiff made statements consistent with what he had told Nurse Sprague, as well as what was on the slips of paper found in the university restroom. Plaintiff told Mr. Liszewski that he had been bullied by three other pharmacy students. They broke into Plaintiff's *948 apartment every night and injected him with poison. Plaintiff moved to a different apartment but the group of students found where he had moved and continued injecting him. (Id. ). Plaintiff had his blood tested at BHC because he did not trust the results from another lab. Plaintiff also showed Mr. Liszewski where on his body he believed he had been injected, but the psychologist did not see any skin puncture or discoloration. (Id. ).
The psychologist told Plaintiff his beliefs were not rational, and Plaintiff's accusations seemed delusional and paranoid. (Id. ). When Plaintiff asked why the police would not help him, the psychologist called the university's chief security officer and allowed Plaintiff to listen in. The officer told Mr. Liszewski that he believed Plaintiff "was schizophrenic and needed to be hospitalized" although he did not think Plaintiff was an "eminent [sic] threat to himself or anyone else." (Id. ). Mr. Liszewski recommended that Plaintiff go to a mental health agency or the ER, but Plaintiff refused. (ECF No. 59-11, PageID.1650). After conferring with a physician, Mr. Liszewski did not believe he had the right to do anything besides what he had recommended. (Id. ).
III. Pharmacy Program Administrators Decide to Petition for Plaintiff's Hospitalization.
Pharmacy program administrators remained concerned and decided to take action. Events moved quickly on September 24, 2013. On that date, a Behavior Review Team ("BRT") meeting was convened to discuss Plaintiff's mental health.[5] (ECF No. 1, PageID.7). The team was composed of several individuals, including Defendant Bates and Defendant Renee Vander Myde.[6] According to minutes taken during the meeting, the BRT discussed Plaintiff's poor attendance, his visits to BHC, the statements he had made to his physicians and professors, and the slips of paper that had been found. (ECF No. 59-15, PageID.1712-1713). Defendant Bates told the team that Plaintiff had admitted to writing the notes on the slips of paper, and that Plaintiff was "on his 'last strike' " and "very close to being dismissed[.]" (ECF No. 59-15, PageID.1713). Defendant Bates stated he had spoken with Plaintiff about a medical withdrawal from the pharmacy program, but Plaintiff was not interested in withdrawing.
Ultimately, Defendant Vander Myde decided Plaintiff needed to be hospitalized. Following a short talk with Plaintiff, Defendant Vander Myde completed a "Petition/Application for Hospitalization." (ECF No. 1-4, PageID.70). On the form, Defendant Vander Myde stated Plaintiff had a mental illness requiring treatment and checked three boxes reflecting her belief that that:
as a result of this mental illness, [Plaintiff] can be reasonably expected within the near future to intentionally or unintentionally seriously physically injure [him]self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of this expectation.
[Plaintiff] is unable to attend to those basic physical needs that must be attended to in order to avoid serious harm in the near future, and has demonstrated *949 that inability by failing to attend to those basic physical needs.
[Plaintiff's] judgment is so impaired [ ]he is unable to understand the need for treatment. Continued behavior as the result of this mental illness can be reasonably expected, on the basis of competent clinical opinion, to result in significant physical harm to self or others.
(ECF No. 1-4, PageID.70). Defendant Vander Myde also wrote that:
The health center physician, a staff counselor, and at least two members of the faculty have expressed concerns to me and shared detailed information regarding John Mbawe and his mental status. I spoke with John Mbawe today and he made several delusional and paranoid statements regarding his belief others are trying to kill him by coming into his apartment at night and injecting him with poison and drugs. He is refusing to eat because he believes his food is being poisoned as well.
(ECF No. 1-4, PageID.70). Defendant Vander Myde then faxed the completed form to the Kent County Probate Court.[7] After reviewing the petition, the State court entered an order dated the same day that required Plaintiff be taken into custody and examined by mental health professionals. (ECF No. 1-4, PageID.71).
IV. The State Court Orders Plaintiff Hospitalized
On October 1, 2013, Grand Rapids police located Plaintiff at the university's campus and took Plaintiff into protective custody for a 48 hour hold. (ECF No. 1-5, PageID.73-74). Plaintiff was first taken to Network 180, a mental health facility, then to St. Mary's Hospital, and ultimately to Pine Rest Christian Mental Health Services. (ECF No. 1-5, PageID.73). Plaintiff subsequently was examined by two physicians. Both physicians concluded that Plaintiff had a mental illness requiring treatment, and recommended hospitalization. (ECF No. 24-2, PageID.259-262). Plaintiff was hospitalized at Pine Rest through October 16, 2013.
On October 2, 2013, the day after Plaintiff was hospitalized, Defendant Vander Myde notified the university that Plaintiff had been placed on medical leave, and that the BHC would let the university know if Plaintiff withdrew from the program. (ECF No. 1, PageID.10). On October 10, 2013, a hearing regarding Plaintiff's hospitalization was held in the Kent County Probate Court. At the hearing Defendant Vander Myde, Dr. Verle Bell (a staff psychiatrist from Pine Rest), and Plaintiff all testified. Following the hearing, Judge Mark Feyen found Plaintiff was a person requiring treatment under the mental health code and ordered Plaintiff's continued treatment for up to ninety days - sixty of which could consist of hospitalization. (ECF No. 59-18, PageID.1756-1777).
V. Program Administrators Decide to Withdraw Plaintiff from the Pharmacy Program and University.
The day after the State court ordered Plaintiff's continued hospitalization, the BRT met to discuss Plaintiff's status in the pharmacy program. During the conversation, *950 the team discussed the university's student handbook, the program's technical standards, and the university's dismissal policy. (ECF No. 59-19, PageID.1779). It was noted that Plaintiff's "licensure issues may trump all of this," however a team member recommended staying on the "academic side of things." (Id. ). Given the State court's commitment order, Plaintiff was obviously in a tenuous position academically and on his licensure. The only question remained how to manage that reality.
Following further discussion, it was decided that Plaintiff should be withdrawn from the university for medical reasons, and Defendant Bates e-mailed Defendant Vander Myde on October 15, 2013, to "formally request[ ] that a Medical Withdrawal be processed" for Plaintiff. (ECF No. 59-19, PageID.1780). Defendant Bates expanded on this by stating that the request was made "[d]ue to [Plaintiff's] inability to attend classes related to a medical condition and in an effort to help [Plaintiff] avoid failing his classes this semester[.]" (Id. ). The same day, Defendant Durst, the Dean of the College of Pharmacy, e-mailed the BRT to state that the university had decided to medically withdraw Plaintiff from the pharmacy program. Defendant Durst also informed Plaintiff's professors. (ECF No. 1, PageID.10).
Plaintiff contends the procedures used to arrive at the withdrawal decision were contrary to the university's established policy for handling students that school officials believed had mental health problems and also ran against the university's policy that medical withdrawals could only be initiated by a student. Plaintiff further argues the withdrawal compromised his license because he was no longer enrolled as a student in the program.[8] Of course, the University had no general policy for dealing with students who were the subject of an involuntary commitment order. By choosing to use a medical basis for withdrawal, rather than the normal academic basis, Defendants believed they were preserving an easier pathway for Plaintiff's return. (ECF No. 59-16, PageID.1724). In either case, the State court's commitment order ensured that the Michigan licensing authority would be involved in any such return.
VI. Plaintiff Finds Out He was Withdrawn and Appeals
After he was discharged from Pine Rest on October 16, 2013, Plaintiff contacted two of his professors asking to make up lost work. One of Plaintiff's professors told him about Defendant Durst's e-mail and advised Plaintiff to contact Defendant Durst. (ECF No. 59-16, PageID.1720-1721). Plaintiff did so, and on October 17, Plaintiff met with Defendants Durst and Bates. Plaintiff's cousin, a professor based in Chicago, also participated via telephone. (Pl.'s Dep. at 245, ECF No. 58-3, PageID.1039). During the meeting, the Defendants confirmed to Plaintiff that he had been withdrawn from the program and explained Plaintiff's academic situation to him. (ECF No. 59-16, PageID.1724).
*951 Plaintiff requested information on how to appeal, and the day after the meeting Plaintiff was told to submit an appeal to Defendant Paul Blake (the Associate Provost for Academic Affairs at Ferris State). (ECF No. 1, PageID.13). Following the October 17th meeting, Defendant Bates referred Plaintiff to HPRP. (ECF No. 58-23, PageID.1207). This appears to have been informal at first, with a formal referral received by HPRP on November 4, 2013. (ECF No. 45-7, PageID.560).
Plaintiff submitted an appeal on October 21, 2013. In it, Plaintiff claimed to have been discriminated against because he was African American.[9] (ECF No. 59-26, PageID.1845-1847). During the pendency of Plaintiff's appeal, Defendant Durst wrote to Defendant Blake. Defendant Durst stated that he and Defendant Bates felt that "overturning [Plaintiff's] medical withdrawal may place [Plaintiff] in greater peril for an academic dismissal, which will likely make the task of gaining readmission even more difficult at some point down the road." (ECF No. 59-16, PageID.1724). Defendant Durst added that Defendant Bates was gathering Plaintiff's current grades to assess Plaintiff's current standing, and that the program had "yet to approach the issue related to licensure and [Plaintiff's] ability to obtain and maintain either an intern license or a pharmacist license." (Id. ).
On October 22, 2013, Defendant Bates e-mailed Plaintiff's professors to ask whether Plaintiff would be able to pass his classes if he were given excused absences from October 1, 2013, onward. (ECF No. 59-16, PageID.1735). Plaintiff's professors responded with various degrees of uncertainty. One stated that it was "theoretically possible" for Plaintiff to pass. (ECF No. 59-16, PageID.1726). Another said Plaintiff's current grade was a C, but it was impossible to predict where Plaintiff would end up at the close of the semester. (ECF No. 59-16, PageID.1728). Another responded that if she were forced to choose, Plaintiff would fail. (ECF No. 59-16, PageID.1733). Finally another professor responded that if Plaintiff could make up a missed midterm, Plaintiff could theoretically pass the class. (ECF No. 59-16, PageID.1731). No professor was willing to provide an unqualified prediction of success.
Defendants Durst, Bates, and Blake met with Plaintiff on November 5, 2013, to discuss his appeal. Plaintiff was told his appeal had been denied, and the withdrawal would stand, for three reasons: (1) he had missed too many classes; (2) Plaintiff was already on the remedial track of the pharmacy program; and (3) Plaintiff had been reported to the HPRP and would need to reconcile his licensure issue before returning to the internship. (ECF No. 1-9, PageID.86).
Plaintiff requested a formal letter regarding his appeal from Defendants. On November 18, 2013, Defendant Blake wrote Plaintiff and restated the appeal was being denied for three reasons:
1. The time you had missed from class was significant and the unanimous assessment of your professors was that you could not successfully complete your courses.
2. Since you were already on a remediation track within the Pharmacy Program and were at risk of academic dismissal, upholding the medical withdrawal would reduce your risk of dismissal from the Program.
*952 3. Most importantly, your licensure to complete your internship had been compromised and until that issue was/is resolved you would not be able to complete your internship.
(ECF No. 59-26, PageID.1848-1849). Plaintiff was told that the "next steps for re-engagement in the Pharmacy Program are to gain clearance from HPRP and reapply to the University and the Pharmacy Program. This is University policy." (ECF No. 59-26, PageID.1849). A month later, when it appeared to Defendant Durst that Plaintiff was not interested in reapplying, Defendant Durst wrote that the pharmacy program should contact the state licensing board and inform them that Plaintiff had been dismissed from the program. Defendant Durst further noted Plaintiff's license had been suspended since he was no longer enrolled in the pharmacy program and Plaintiff's failure to comply with HPRP made it doubtful that Plaintiff would be re-licensed. (ECF No. 59-16, PageID.1745).
VII. Administrative Action
Plaintiff initially did not respond to HPRP's communications, and Plaintiff's case was closed as non-compliant on December 12, 2013. (ECF No. 45-6, PageID.555). Thereafter, it appears Plaintiff petitioned to reopen the case and his request was granted. Once his case was reopened, HPRP required Plaintiff to undergo a psychiatric evaluation with Dr. Bela Shah, M.D. (ECF No. 45-6, PageID.554-557). Dr. Shah's evaluation was conducted on January 29, 2014. The doctor found Plaintiff to be cooperative, but evasive at times. Plaintiff had spontaneous speech, with an euthymic mood and appropriate affect. Plaintiff also appeared alert and oriented, but he had limited insight. (ECF No. 45-6, PageID.556). Dr. Shah's impression was that Plaintiff had delusional beliefs with some paranoid psychotic behaviors. She noted Plaintiff had stopped taking his medications after his hospitalization at Pine Rest, and the doctor diagnosed Plaintiff with a delusional disorder and assigned him a GAF score of 54.[10] The doctor recommended that Plaintiff be monitored by HPRP for his mental health disorder, that he receive therapy, and that he meet with a psychiatrist to restart his medication regimen. Dr. Shah further concluded that Plaintiff could not safely practice with his educational license until Plaintiff's condition had stabilized, he had restarted his medications, and signed a monitoring agreement with HPRP. (ECF No. 45-6, PageID.557).
The HPRP concurred with Dr. Shah that Plaintiff should be placed under a monitoring agreement. It further agreed that Plaintiff could not safely practice under his educational license. Thereafter, Plaintiff was sent a monitoring agreement that required, inter alia , Plaintiff attend therapy. (ECF No. 58-43 ). Plaintiff received *953 the monitoring agreement, but did not sign it. After Plaintiff refused to sign the monitoring agreement, HPRP closed the case and forwarded it to the Michigan Department of Licensing and Regulatory Affairs ("LARA") for further action.[11] (ECF No. 45-7, PageID.561).
Thereafter, LARA brought an administrative complaint against Plaintiff. (ECF No. 45-7, PageID.559). The complaint alleged that Plaintiff's conduct "indicates that [Plaintiff] suffers from a mental or physical inability reasonably related to and adversely affecting [Plaintiff's] ability to practice in a safe and competent manner[.]" (ECF No. 45-7, PageID.562). LARA recommended that a hearing be held, and that Plaintiff's limited educational license ultimately be suspended. (Id. ). When Plaintiff did not respond to the complaint, however, LARA issued a Final Order dated October 2, 2014, that summarily suspended Plaintiff's educational license for a minimum of six months and one day for violation of MICH. COMP. LAWS § 333.16221(b)(iii).[12] (ECF No. 45-8, PageID.565-568). Plaintiff was also fined, and LARA ordered that if Plaintiff sought relicensure or reinstatement, he would first be required to seek permission. (ECF No. 45-8, PageID.566). Plaintiff filed a request for reconsideration, however his request was rejected as being untimely. (ECF No. 58-25, PageID.1242). It does not appear Plaintiff has applied for relicensure since the suspension and expiration of his educational license.
On July 29, 2016, the Department of Education's Office for Civil Rights concluded its investigation. (ECF No. 1-1, PageID.63-64). Plaintiff brought this action on September 30, 2016. Defendants filed the instant motion on September 26, 2017, and move for summary judgment on all counts.
LEGAL STANDARD
Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Parks v. LaFace Records , 329 F.3d 437, 444 (6th Cir. 2003) (citing FED. R. CIV. P. 56(c) ). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the Court views the evidence and draws all reasonable inferences in favor of the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). But that does not mean that any amount of evidence, no matter how small, will save a nonmoving party from losing on a motion for summary judgment. Scott v. Harris , 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).
DISCUSSION
I. Initial Matters
On August 25, 2017, the Court ordered the parties to submit supplemental briefing on the state processes and whether subject matter jurisdiction existed to bring suit in this Court. (ECF No. 55 ). The *954 parties have each filed briefs, and responses to those briefs. Based on further development of the factual record, the Court is satisfied it has jurisdiction over the matter, and can address the merits of the case.
There are also a number of other pending substantive motions. These include Defendant Vander Myde's Motion for Judgment on the Pleadings (ECF No. 23 ), Defendant Ferris State's Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim (ECF No. 29 ), Defendants' Motion to Compel Psychiatric Examination (ECF No. 44 ), Defendants' Motion in Limine regarding records of Plaintiff's arrest in Maryland (ECF No. 52 ), and Defendants' Second Motion to Compel Plaintiff to Respond to Defendants' Requests for Admissions (ECF No. 71 ). The Motion for Judgment on the Pleadings will be denied as moot because Defendant Vander Myde is the prevailing party here. The Motion to Dismiss for Lack of Jurisdiction will be denied since the Court concludes it has jurisdiction over the matter. The remaining substantive motions will also be denied. Neither a psychiatric evaluation, nor the alleged events in Maryland, records from the Grand Rapids police, or communication records from the HPRP were necessary to reach the conclusion that Defendants are entitled to summary judgment on all counts.
II. Plaintiff's Claims
Since Plaintiff has stipulated to the dismissal of the conspiracy claim, there are four remaining claims in Plaintiff's Complaint: the two statutory claims for violations of Title II of the ADA and Section 504 of the Rehabilitation Act, and the two constitutional claims for violations of Plaintiff's substantive and procedural due process rights. For reasons discussed below, Defendants are entitled to summary judgment on all the remaining claims.
A. Statutory Claims
1. Requirements of a Title II and Section 504 Case
In the first two claims of his Complaint, Plaintiff argues Defendant Ferris State University discriminated against him in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et. seq. , and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[13] Each act allows qualified individuals with a disability "to sue certain entities ... that exclude them from participation in, deny them benefits of, or discriminate against them in a program because of their disability." Gohl v. Livonia Public Schs. Sch. Dist. , 836 F.3d 672, 681 (6th Cir. 2016). In circumstances where, as here, the differences between the two statutes are immaterial to resolving the claims of the case, courts in the Sixth Circuit analyze the two claims together. S.S. v. Eastern Kentucky Univ. , 532 F.3d 445, 452-453 (6th Cir. 2008).
A plaintiff can "defeat a summary judgment motion through an indirect *955 or direct showing of discrimination." Gohl , 836 F.3d at 682. To proceed with an indirect case, the familiar McDonnell Douglas test applies, and a plaintiff is required to show "that he (1) is disabled under the statutes, (2) is 'otherwise qualified' for participation in the program, and (3) 'is being excluded from participation in, denied the benefits of, or subjected to discrimination' because of his disability or handicap, and (4) (for the Rehabilitation Act) that the program receives federal financial assistance." Id. (quoting G.C. v. Owensboro Public Schs. , 711 F.3d 623, 635 (6th Cir. 2013) ). Where the claim is based on direct evidence of discrimination, a plaintiff "must simply produce enough evidence of discrimination to persuade a reasonable jury that animus was a but-for cause of the challenged act." Id. (quoting Morgan v. SVT, LLC , 724 F.3d 990, 995 (7th Cir. 2013) ). However, under either test, Plaintiff bears the burden of showing that he is "otherwise qualified." Hardenburg v. Dunham's Athleisure Corp. , 963 F.Supp.2d 693, 701 (E.D. Mich. 2013).
2. Whether Plaintiff was "Otherwise Qualified" to Continue in the Pharmacy Program .
For the purposes of the instant motion, Defendants concede that Plaintiff has a disability as defined by the statutes. (ECF No. 62, PageID.1866). However, Defendants argue that at the time Plaintiff was withdrawn he was not "otherwise qualified" to participate in the pharmacy program. The Court agrees.
"A handicapped or disabled person is 'otherwise qualified' to participate in a program if [ ]he can meet its necessary requirements with reasonable accommodation." Kaltenberger v. Ohio Coll. of Podiatric Med. , 162 F.3d 432, 435 (6th Cir. 1998) (citing Sandison v. Mich. High Sch. Athletic Ass'n, Inc. , 64 F.3d 1026, 1034 (6th Cir. 1995) ). " 'A plaintiff asserting a violation of the ADA or Rehabilitation Act bears the burden to establish that he is qualified.' " Shaikh v. Lincoln Mem'l Univ. , 608 F. App'x 349, 353 (6th Cir. 2015) (quoting Halpern v. Wake Forest Univ. Health Scis. , 669 F.3d 454, 462 (4th Cir. 2012) ). Specifically, "Plaintiff must present sufficient evidence to show he could satisfy the program's necessary requirements, or that any reasonable accommodation by the school would enable him to meet these requirements." Yaldo v. Wayne State Univ. , 266 F.Supp.3d 988, 1011 (E.D. Mich. 2017) (citing Shaikh , 608 F. App'x at 353 ). When reviewing "the substance of a genuinely academic decision" courts "should show great respect for the faculty's professional judgment." Regents of Univ. of Mich. v. Ewing , 474 U.S. 214, 255, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). This is especially true " 'regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession.' " Kaltenberger , 162 F.3d at 437 (quoting Doherty v. Southern Coll. of Optometry , 862 F.2d 570, 576 (6th Cir. 1988) ).
a. The Pharmacy Program's Technical Standards and Licensure Requirement
The Technical Standards for admitted students in the pharmacy program required students to "meet required aptitude, abilities and skills" in several skill areas. Two of those skills appear as follows:
4.5 Behavioral and Social Attributes: An applicant or student must possess the emotional and mental health required for full utilization of their abilities, exercise good judgment and prompt completion of responsibilities. Empathy, *956 integrity, honesty, concern for others, patience, good interpersonal skills, strong work ethic and motivation are required. Applicants and students must be capable of developing the maturity to maintain a professional demeanor and organization in the face of long hours, personal fatigue, and dissatisfied patients and colleagues under varying degrees of stress. Students will, at times, be required to work for extended periods of time outside of the 8am-5pm "work day". Students must be able to maintain a level of behavior, demeanor, personal hygiene, communication and dress that is expected of patient and caregivers in acute, sub-acute and community practice settings, as well as the classroom and laboratory setting.
4.6 Ethical Values: An applicant and student must demonstrate a professional demeanor, conduct and behavior that are appropriate to his/her standing in the professional degree program. This includes compliance with the administrative rules applicable to the profession of pharmacy; and honor codes of the College of Pharmacy and Ferris State University. Under all circumstances, students must protect the confidentiality of any and all patient information in their professional and personal communications. Students must meet the ethical standards set forth in the profession of pharmacy. In addition, students must be able to obtain and maintain a valid Pharmacist Intern license in the State of Michigan and pass requisite criminal background check, drug tests/screens, immunization/tests, and training required by the Michigan Board of Pharmacy rules, Michigan law and/or Ferris State University College of Pharmacy affiliated experiential sites and their accrediting and/or regulatory agencies.
(ECF No. 69-1, PageID.2503-2504). There is no dispute that these were necessary requirements for participation in the pharmacy program. And no reasonable jury could find that Plaintiff was able to meet these necessary skills without accommodation when he was withdrawn. When the State court ordered Plaintiff's treatment for a period up to ninety days, the court had the opinions of two examining physicians who both found Plaintiff met Michigan's statutory definition of a mental illness,[14] that is, a "substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." (ECF No. 24-2, PageID.259, 261). The State court also heard from Dr. Verle Bell, who testified that even though Plaintiff might be discharged soon after the hearing, Plaintiff represented a danger because "if you think someone is trying to kill you and you're a highly intelligent, otherwise logical, capable person, you might do something to defend yourself when there's no need of defense. There's at least one indication that that was tried." (ECF No. 59-18, PageID.1765). Dr. Bell further testified that Plaintiff represented a threat to himself or others "because of the belief that people might be trying to kill him, and he would take what seems to him as a rational, appropriate response to when there is no threat. Then there is ... calling the police constantly. That certainly harasses the system and puts a-you know, they-they could respond thinking he's in danger and endanger themselves in the process." (ECF No. 59-18, PageID.1766). Based on this testimony, the State court determined that Plaintiff was a "person requiring treatment" under MICH. COMP. LAWS § 330.1401, a determination Plaintiff did not further challenge. All this occurred only days before *957 Plaintiff was withdrawn from the pharmacy program and university. In short, Plaintiff's submissions here show that he could not demonstrate good judgment or exercise professional behavior, both necessary requirements of the pharmacy program as contained in the Technical Standards.
Moreover, at the time the decision was made to withdraw Plaintiff from the program, Plaintiff plainly could not maintain his limited educational license. The State court's order meant Plaintiff was significantly impaired in his judgment and behavior. See MICH. COMP. LAWS § 330.1400(g) and § 330.1401. Under MICH. COMP. LAWS § 333.16221, LARA is required to, inter alia , investigate an allegation that a health professional licensee has a mental inability that adversely affects that licensee's ability to practice in a safe and competent manner. Id. Other licensees have an obligation to report an individual they have knowledge of or reasonable cause to believe is impaired or in violation of Section 16221. See MICH. COMP. LAWS §§ 333.16222(1) ; 333.16223(1). Members of the BRT appeared well aware of this obligation, as the October 11, 2013, meeting minutes document the team's concern that Plaintiff's "licensure issues may trump all of this." (ECF No. 59-19, PageID.1779). And by the time Plaintiff's appeal was formally denied, Defendants had acted on this obligation by reporting Plaintiff to HPRP. (ECF No. 1-9, PageID.86). In sum, the administrative process leading to the suspension of Plaintiff's limited educational license began prior to the time when the final denial of Plaintiff's appeal was made. Without cooperating with this process to a successful conclusion-which Plaintiff did not-Plaintiff could not maintain his educational license and was not an "otherwise qualified" individual.
This conclusion is consistent with a line of cases discussing ADA claims brought by commercial truck drivers. See Williams v. J.B. Hunt Transp., Inc. , 826 F.3d 806, 811 (5th Cir. 2016) ; Harris v. P.A.M. Transp., Inc. , 339 F.3d 635, 636-37 (8th Cir. 2003) ; Bay v. Cassens Transport Co. , 212 F.3d 969, 973-76 (7th Cir. 2000) ; King v. Mrs. Grissom's Salads, Inc. , No. 98-5258, 1999 WL 552512, at *1-*3 (6th Cir. 1999). In these cases, the commercial truck drivers were found not qualified after either (1) failing to obtain a medical examiner's certificate of DOT qualification or, (2) failing to resolve a conflict of medical opinions under agency procedures. In King , for example, two physicians disagreed over whether an ADA plaintiff was qualified under the DOT regulations. When the plaintiff did not seek resolution of the disagreement with the Department of Transportation, the Sixth Circuit affirmed the district court's conclusion that the plaintiff was not a qualified individual because the plaintiff lacked the requisite certification and failed to exhaust the administrative procedures. King , 1999 WL 552512, at *2-*3. Likewise in Williams , the Fifth Circuit held that an employer's administrative termination of the commercial driver plaintiff did not violate the ADA because the employee was not qualified. The court based the decision on the fact that the employee lacked DOT certification that he was physically qualified to drive and never sought review. Williams , 826 F.3d at 811-12.
While the occupations may be different than that of the instant case, the analysis is the same. After his involuntary hospitalization, Plaintiff's license was in jeopardy: the commitment order gave LARA grounds to investigate, and the pharmacy program was obligated to report Plaintiff. Administrative action was inevitable, and when it came, Plaintiff failed to see the process through to a successful completion. Accordingly, no reasonable jury could find *958 that without an accommodation, Plaintiff was qualified to participate in the pharmacy program.
b. "With ... Reasonable Accommodation"
The remaining question in the "otherwise qualified" analysis is whether Plaintiff could perform the necessary requirements of the pharmacy program with reasonable accommodation. Here, Plaintiff has the burden of showing "he proposed a reasonable accommodation to account for his disability." Shaikh , 608 F. App'x at 354 (quoting Jakubowski v. Christ Hosp., Inc. , 627 F.3d 195, 202 (6th Cir. 2010) ). No reasonable jury could find that Plaintiff did. The only accommodation that Plaintiff possibly requested on this record was the decelerated schedule allowing him an extra year within which he could complete his academic instruction. Plaintiff avers he received this accommodation when he enrolled in the pharmacy program, and thus was on the schedule during the events in question. Plainly, for reasons discussed above, Plaintiff was not performing the pharmacy program's necessary requirements with this accommodation when he was withdrawn. Plaintiff never proposed any additional accommodations to the pharmacy program. Because of this, Plaintiff has failed to satisfy his burden. See Jakubowski , 627 F.3d at 202 (stating "[i]f a disabled employee requires an accommodation, the employee is saddled with the burden of proposing an accommodation and proving that it is reasonable.").
None of Plaintiff's arguments to the contrary are persuasive. Plaintiff argues that the pharmacy program failed to follow the university's policies for students with mental illness. Even assuming for purposes of argument that is true, it does not amount to a violation of Title II or Section 504. "[T]he relevant inquiry is whether [the pharmacy program] violated the ADA or Section 504 of the Rehabilitation Act, not whether [the pharmacy program] followed its internal policies." Shaikh , 608 F. App'x at 355. Second, Plaintiff contends that Defendants needed to engage in an interactive process with Plaintiff before it could be determined if Plaintiff was otherwise qualified.[15] (ECF No. 69, PageID.2486). Plaintiff's argument is contrary to the "general rule [that] the [plaintiff] must request a reasonable accommodation to trigger the [defendant's] duty to engage in the interactive process." Arredondo v. Howard Miller Clock Co. , No. 1:08-cv-103, 2009 WL 2871171, at *9 (W.D. Mich. Sept. 2, 2009) ; see also Taylor v. Principal Financial Group, Inc. , 93 F.3d 155, 165 (5th Cir. 1996). Indeed, a plain reading of the relevant regulation makes clear that whether a plaintiff is a qualified individual is distinct from a defendant's obligation to engage in the interactive process. See Arredondo , 2009 WL 2871171, at *8 (noting that "[o]n a facial reading of the statutory text and the ... regulation, the Court's ruling that [Plaintiff] was not a 'qualified individual' should be dispositive of the interactive process requirement").
For a related reason, Plaintiff's third argument that he should have been allowed other accommodations such as a transfer to a different program at the university fails. "In order to establish a prima facie case of disability discrimination under the statute, [Plaintiff] must show that he requested, and was denied, reassignment to a position for which he was otherwise *959 qualified." Burns v. Coca-Cola Enterprises, Inc. , 222 F.3d 247, 258 (6th Cir. 2000) ; see also Jakubowski , 627 F.3d at 201-202. Plaintiff's identification of possible accommodations appear for the first time in the instant litigation, and do not appear to have been proposed to the pharmacy program.
Even if Plaintiff could show he requested these accommodations, his claim would fail because Defendants offered a reasonable accommodation: successfully complete the HPRP program. Plaintiff failed to pursue the program to completion. Though he contends he should have been offered different accommodations, Plaintiff cannot force the pharmacy program to provide a specific accommodation if the program offered an alternative reasonable accommodation. Tennial v. United Parcel Service, Inc. , 840 F.3d 292, 307 (6th Cir. 2016). Given the State court's commitment order, the pharmacy program's offer that Plaintiff cooperate with the HPRP as a condition of re-admittance was eminently reasonable, and Plaintiff fails to persuasively demonstrate otherwise.
For all the above reasons, and drawing all inferences in favor of Plaintiff, the Court concludes Plaintiff was not "otherwise qualified" because he could not perform the necessary requirements of the pharmacy program, with or without reasonable accommodations. Because Plaintiff has not met his burden under either an indirect or direct evidence theory, the Court need not address the other elements of a prima facie case or the pharmacy program's sovereign immunity defense.
B. Constitutional Claims
Plaintiff's remaining claims allege violations of both his substantive and procedural due process rights under 42 U.S.C. § 1983. For the reasons discussed below, no reasonable jury could find in Plaintiff's favor on either claim.
1. Substantive Due Process
Plaintiff first claims Defendants violated his substantive due process rights by terminating Plaintiff's enrollment in the pharmacy program.
"The substantive component of the Due Process Clause protects 'fundamental rights' that are so 'implicit in the concept of ordered liberty' that 'neither liberty nor justice would exist if they were sacrificed.' " Doe v. Michigan Dept. of State Police , 490 F.3d 491, 499 (6th Cir. 2007) (quoting Palko v. Conn. , 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937) ). "Such rights include 'the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion.' " Id. (quoting Washington v. Glucksberg , 521 U.S. 702, 720-21, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997) ). "The Supreme Court has cautioned, however, that it has 'always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.' " Id. (quoting Glucksberg, 521 U.S. at 720, 117 S.Ct. 2302 ).
Indeed, the Supreme Court has generally refrained from determining whether continued enrollment in a school free from arbitrary state action is protected by substantive due process, and in cases discussing the issue, the Court has only assumed, arguendo , that such a fundamental right exists. See, e.g., Regents of Univ. of Mich. , 474 U.S. at 222-23, 106 S.Ct. 507 ; Bd. of Curators of Univ. of Mo. v. Horowitz , 435 U.S. 78, 91-92, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). The Sixth Circuit Court of Appeals has gone further, however, and has concluded that absent an equal protection violation there is no substantive due process right to continued enrollment at a *960 state university. See Reyes v. Bauer, No. 11-15267, 2013 WL 3778938, at *12 (E.D. Mich. July 18, 2013) (collecting cases); Bell v. Ohio State Univ. , 351 F.3d 240, 251 (6th Cir. 2003) ("Where ... there is no equal protection violation, we can see no basis for finding that a medical student's interest in continuing [his] medical school education is protected by substantive due process."); see also Hill v. Bd. of Trs. of Michigan State Univ., 182 F.Supp.2d 621, 626-27 (W.D. Mich. 2001) ("The Sixth Circuit has recognized that the right to attend public high school is not a fundamental right for purposes of substantive due process analysis. The right to a public college education and the right to receive notice prior to suspension are even less fundamental.") (citations omitted).
Plaintiff argues he has shown a violation of equal protection to distinguish the above line of cases. (ECF No. 69, PageID.2496). He points the Court to his Complaint, in which he avers he had a right to continue in his studies if his dismissal "was based on generalization or stereotypes about a protected class of persons." (ECF No. 1, PageID.28). Assuming, without deciding, this is sufficient to state a claim for an equal protection violation, Plaintiff cannot succeed. "Disabled persons are not a suspect class for purposes of an equal protection challenge." S.S. , 532 F.3d at 457 (citing Tennessee v. Lane , 541 U.S. 509, 522, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) ). To show an equal protection violation, therefore, Plaintiff must show: (1) Defendants "intentionally treated him differently-because he is disabled-than similarly situated students who were like him in all relevant respects, and (2) the defendants' actions bore no rational relationship to a legitimate governmental purpose." Id. at 458. Plaintiff avers he was intentionally treated differently than similarly situated students (see ECF No. 59, PageID.1418-1419) but he has not shown that Defendants' actions bore no rational relationship to a legitimate governmental purpose. Dr. Bell testified in front of the State court that Plaintiff was a threat to himself and to others. (ECF No. 59-18, PageID.1766). The State court agreed Plaintiff required treatment. Schools have a legitimate educational purpose in maintaining order and safety for its students and its school. S.S. , 532 F.3d at 458. Moreover, Plaintiff has no convincing comparator because no one other than Plaintiff was involuntarily committed by a State court.
Plaintiff has not shown an equal protection violation that would preclude application of the above Sixth Circuit authority. Therefore, read in the light most favorable to Plaintiff, Plaintiff's allegations do not amount to a violation of his substantive due process rights and Defendants are entitled to summary judgment on the substantive due process claim. See Bell , 351 F.3d at 251.
2. Procedural Due Process
Plaintiff finally contends that Defendants violated his procedural due process rights when he was withdrawn from the university. The elements of a procedural due process claim are: (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. Women's Med. Prof'l Corp. v. Baird , 438 F.3d 595, 611 (6th Cir. 2006). Analysis of a procedural due process claim involves two steps: "First, the Court must determine whether the interest at stake is a protected liberty or property interest under the Fourteenth Amendment. Only after identifying such a right do [courts] continue to consider whether the deprivation of that interest contravened the notions of due process under the Fourteenth Amendment"
*961 Puckett v. Lexington-Fayette Urban Cty. Gov't , 833 F.3d 590, 604-605 (6th Cir. 2016) (internal quotation marks omitted). "The amount of process due will vary according to the facts of each case and is evaluated largely within the framework laid out by the Supreme Court in Mathews v. Eldridge [.]" Flaim v. Med. Coll. of Ohio , 418 F.3d 629, 634 (6th Cir. 2005) (citing Mathews v. Eldridge , 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ).[16]
For purposes of this discussion, the Court will assume that a pharmacy student like Plaintiff has a property and liberty interest in continued enrollment in the pharmacy program and has satisfied the first element of a procedural due process claim. Turning, then, to the second element, the parties disagree on what process Plaintiff was due, and whether he received that process. Plaintiff contends he was entitled to notice and a hearing prior to the October 15, 2013, decision to withdraw Plaintiff from the pharmacy program. (ECF No. 68, PageID.2171-2176). Defendants contend a hearing was not required in order to satisfy procedural due process. (ECF No. 62, PageID.1879). Defendants have the better argument.
The difference in the parties' positions comes down to whether Plaintiff's withdrawal from the program is considered an academic or disciplinary decision. Disciplinary decisions require a "more searching inquiry" than academic decisions. Flaim , 418 F.3d at 634 ; see also Horowitz , 435 U.S. at 86, 98 S.Ct. 948 (noting that academic decisions "call[ ] for far less stringent procedural requirements[.]"). "The term 'academic' in his context is somewhat misleading." Yoder v. Univ. of Louisville , 526 F. App'x 537, 550 (6th Cir. 2013). Generally, "academic evaluations are not limited to consideration of raw grades or other objective criteria." Ku v. State of Tennessee , 322 F.3d 431, 436 (6th Cir. 2003). Rather, reviewing courts usually find an academic dismissal "where a student's scholarship or conduct reflects on the personal qualities necessary to succeed in the field in which he or she is studying and is based on an at least partially subjective appraisal of those qualities." Allahverdi v. Regents of Univ. of New Mexico , No. 05-277, 2006 WL 1313807, at *20 (D.N.M. Apr. 25, 2006) (citing cases); see also Horowitz , 435 U.S. 78, 89-90, 98 S.Ct. 948 (1978) (noting that a decision to dismiss a medical student was academic if it "rested on the academic judgment of school officials that [the student] did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal").
In a case with facts close to those of the instant case, the Fifth Circuit Court of Appeals found that a decision to dismiss a medical student from a residency program for failure to tend to her mental health was an academic decision. Shaboon v. Duncan , 252 F.3d 722 (5th Cir. 2001). As in the instant case, the student in Shaboon was hospitalized for mental health treatment. The student's decision had been voluntary, and she subsequently left treatment against advice. When the student did not cooperate with treatment and exhibited no *962 improvement, the student was dismissed from the residency program. Id. at 725-28. In finding that the decision to dismiss the student was academic, the Fifth Circuit reasoned that "[a]lthough [the student's] intransigence might suggest that her dismissal was disciplinary, her refusal to acknowledge and deal with her problems furnished a sound academic basis for her dismissal." Id. at 731. This analysis is similar to that used in the Sixth Circuit, where "dismissing a medical student for lack of professionalism is academic evaluation." Yaldo , 266 F.Supp.3d at 1005 (citing Al-Dabagh v. Case W. Reserve Univ. , 777 F.3d 355, 360 (6th Cir. 2015) ). The Court finds this authority to be persuasive.
The Defendants in the instant case offered three justifications for denying Plaintiff's appeal. Two are clearly academic: Plaintiff missed a significant amount of class and was in jeopardy of failing his classes. The third reason, also, is academic: Plaintiff could not maintain his professional educational license. (ECF No. 59-26, PageID.1848-1849). It is plain that in offering these reasons, the pharmacy program dismissed Plaintiff not for disciplinary reason, but for reasons related to Plaintiff's ability to succeed in the pharmacy program and Plaintiff's fitness to perform as a pharmacist. Accordingly, the Court holds that the decision to withdraw Plaintiff from the university was an academic decision.
The due process required for academic decisions is "minimal." Yoder , 526 F. App'x at 549. "In the case of an academic dismissal or suspension from a state educational institution, when the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met." Ku , 322 F.3d at 436 (citing Horowitz , 435 U.S. at 85-86, 98 S.Ct. 948 ). No formal hearing is required. Id. The Court finds the requisite process for an academic decision has been met here.
Viewed in the light most favorable to the non-moving party, Plaintiff was fully informed of the pharmacy program's dissatisfaction with his progress. The documents submitted by Plaintiff show Defendant Bates discussed a medical withdrawal from the program with Plaintiff before Plaintiff was hospitalized. (ECF No. 59-15, PageID.1713). Plaintiff's supplemental brief acknowledges that Defendant Bates requested that Plaintiff withdraw. (ECF No. 59, PageID.1420). Though Plaintiff may have disagreed with the request, clearly Plaintiff was on notice the pharmacy program was dissatisfied with his performance to that point and that, in fact, his dismissal from the program was a very real possibility. Moreover, the documents submitted by Plaintiff show that Defendants explained Plaintiff's academic situation during their initial meeting with Plaintiff. (ECF No. 59-16, PageID.1724). And, as noted above, these reasons were expanded upon in subsequent meetings and communications between Plaintiff and program administrators into three primary academic justifications. This was enough to fully inform Plaintiff. See Yoder , 526 F. App'x at 550-551.
The record also establishes that the decision to withdraw Plaintiff from the pharmacy program was careful and deliberate. The decision was reached only after several interactions with Plaintiff, including a State court hearing resulting in Plaintiff's hospitalization. Thereafter several meetings between BRT members and other university officials was held. The minutes show the defendants discussed the university's handbook and dismissal policies, as well as the program's Technical Standards *963 and licensure requirement. (ECF No. 59-19, PageID.1779). Thereafter, Plaintiff was permitted to appeal and the denial of the appeal was twice explained, first in person and then in paper. These actions reflect the careful and deliberate processes called for by Horowitz and its progeny.
In sum, viewing the facts in the light most favorable to Plaintiff, the Court holds no reasonable jury could find Plaintiff was not afforded the requisite process for an academic decision to withdraw him from the pharmacy program.[17] Defendant's motion for summary judgment on this count will be granted.
CONCLUSION
Plaintiff was endeavoring to complete the academic and state regulatory requirements for becoming a pharmacist, a position of trust and responsibility with access to controlled substances. Obviously a successful candidate needs mental stability himself or herself, as Michigan licensure law requires, and as the University's Technical Standards ensure. Once the state court ordered Plaintiff's involuntary commitment-an order that Plaintiff never appealed or had set aside-it is hard to see how any responsible administrator or licensing official could blithely allow Plaintiff to continue in the program as though nothing had happened. And it is equally hard to see how a federal court looking in reflective retrospect could lightly second guess the particular steps these defendants took in an effort to honor their responsibilities to the Plaintiff, the University, and the public.
Like any responsible licensing authority, Michigan has developed a detailed statutory and regulatory process for balancing the competing interests. The process ensures that licensees-including those licensed in a training program-have the technical and personal qualifications and competence to practice safely. And they also ensure that when a licensee is found to lack a competency, he or she has the ability to contest the finding in the first place; and even if ultimately found lacking in some way, to structure a supervised pathway back to full licensure through the HPRP process.
Here, Plaintiff failed to take advantage of the process. He chose not to contest the State court's original order of commitment. He chose not to participate in the licensing authority process that gave him an opportunity to contest the licensing suspension. And he refused to participate in the HPRP process that provided a possible pathway for him towards successful completion of training and eventual practice. Plaintiff cannot spurn these established State law procedures and potential for accommodation, and convincingly argue that these Defendants denied him due process and reasonable accommodation for a mental health condition sufficiently serious to warrant involuntarily hospitalization under a State court order that has never been challenged.
ACCORDINGLY, IT IS ORDERED THAT:
*964 1. Defendants' Motion for Summary Judgment (ECF No. 61 ) is GRANTED.
2. Defendant Vander Myde's Motion for Judgment on the Pleadings (ECF No. 23 ) is DISMISSED AS MOOT.
3. Defendant Ferris State University's Motion to Dismiss for Lack of Jurisdiction and for Failure to State a Claim (ECF No. 29 ) is DENIED.
4. Defendants' Motion to Compel Psychiatric Examination (ECF No. 44 ) is DENIED AS MOOT.
5. Plaintiff's Corrected Motion for Leave to File Excess Pages (ECF No. 49 ) is GRANTED.
6. Defendant's Motion in Limine (ECF No. 52 ) is DENIED AS MOOT.
7. Defendant's Second Motion to Compel (ECF No. 71 ) is DENIED AS MOOT.
This case is DISMISSED.
IT IS SO ORDERED.
JUDGMENT
In accordance with the Opinion and Order entered this day, Judgment is entered in favor of Defendants and against Plaintiff.

Plaintiff also brought a claim of conspiracy under 42 U.S.C. § 1985 but has stipulated to the dismissal of this claim. (ECF No. 69, PageID.2499). Accordingly, the Court need not consider it.

Plaintiff's response brief disputes that the Technical Standards require the license, but the document as submitted by Plaintiff plainly requires the license. (ECF No. 69-1, PageID.2503).

In addition to police records related to Plaintiff's belief his apartment was being broken into, Defendants provide the Declaration of Travis Mitchell, who avers that he was the property manager of a self-storage facility where Plaintiff previously rented a storage unit. Mr. Mitchell states that in July 2013 he required Plaintiff to vacate his unit after Plaintiff accused another tenant of following him. (ECF No. 58-6, PageID.1083). In his deposition, Plaintiff denied harassing anyone, but admitted he was told to vacate the unit. (ECF No. 45-3, PageID.517-518). Defendants also provide an arrest report dated March 5, 2017, from the Hyattsville, Maryland Police Department. The report states Plaintiff was arrested after he allegedly punched a driver whom he believed had been following him. (ECF No. 45-2, PageID.508).

During his deposition, Plaintiff implicitly acknowledged writing the statements, but testified he did not know how they got to the university's bathroom. (Pl.'s Dep. at 202-204, ECF No. 58-3, PageID.1029).

The BRT is a forum for faculty, staff, and students to report observed behaviors of any person within the college community that warrant serious concern. (ECF No. 1-1, PageID.40).

Defendant Vander Myde was the director of the BHC, and herself a limited licensed psychologist.

Plaintiff contends that Defendant Vander Myde made a number of misrepresentations on the petition. Plaintiff does not contest, however, that Plaintiff made the statements Defendant Vander Myde attributed to him or that other school officials were concerned about Plaintiff's behavior. The issue boils down to possible disagreement among school officials about whether Plaintiff's behavior warranted involuntary hospitalization. That disagreement became immaterial when a state probate court judge made the call after considering the recommendation of two independent physicians.

A pharmacy intern must notify the pharmacy board if he is no longer actively enrolled in a pharmacy degree program. Mich. Admin. Code R. 338.473a. (ECF No. 59, PageID.1418). It was the State court's commitment order, itself, however, that was the first action ensuring that Plaintiff's license would be at risk. This is because the school itself was obligated to report the commitment order, which at a minimum established Plaintiff was a person requiring treatment. See Mich. Comp. Laws §§ 333.16221 -22 (identifying grounds for investigation and eventual action by the Department of Licensing and Regulatory Affairs, and requiring reporting); Mich. Comp. Laws §§ 330.1400(g), 1401 (describing findings necessary for a commitment order).

Plaintiff is actually from Cameroon, Africa and was admitted to the United States on asylum. (ECF No. 59-2, PageID.1439). He is currently a resident of Maryland. Plaintiff is not pursuing a race or alienage claim.

The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning" on a hypothetical continuum of mental health-illness. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) , (4th ed., text rev., 2000), pp. 32, 34. The GAF score is taken from the GAF scale, which rates individuals' "psychological, social, and occupational functioning," and "may be particularly useful in tracking the clinical progress of individuals in global terms." Id. at 32. The GAF scale ranges from 100 to 1. Id. at 34. At the high end of the scale, a person with a GAF score of 100 to 91 has "no symptoms." Id. At the low end of the GAF scale, a person with a GAF score of 10 to 1 indicates "[p]ersistent danger of hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." Id. A GAF score of 54 reflects the clinician's judgment that the individual suffers from moderate symptoms or moderate difficulty in social, occupational, or school functioning. Id.

See Lucas v. Ulliance, Inc. , No.15-10337, 2016 WL 1259108, at *2 (E.D. Mich. Mar. 31, 2016) for a discussion of the interplay between LARA and HPRP.

This statute allows LARA to take disciplinary action against a licensee who has a "[m]ental or physical inability reasonably related to and adversely affecting the licensee's or registrant's ability to practice in a safe and competent manner." Mich. Comp. Laws. § 333.16221(b)(iii).

In both counts, Plaintiff contends the university discriminated against him by: (1) subjecting him to a process that did not exist under the university's policies and procedures; (2) allowing students, but not Plaintiff, to continue their education regardless of their medical condition or situation; (3) choosing not to follow the university's written policy and procedures for handling students with mental health crises; (4) failing to provide due process protections to Plaintiff that were afforded to other students; (5) denying Plaintiff access to campus; (6) requiring Plaintiff be escorted to a meeting with the Dean of the pharmacy program; (7) reporting Plaintiff to HPRP; and (8) providing greater due process protections to students who represented an actual threat. (ECF No. 1, PageID.20-21, 23-24).

Compare ECF No. 24-2, PageID.259, 261 with Mich. Comp. Laws § 330.1400(g).

ADA regulations state that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3).

The Mathews Court articulated the test as follows:
[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Mathews , 424 U.S. at 335, 96 S.Ct. 893.

Even if the Court were to conclude the decision to withdraw Plaintiff from the pharmacy program was a disciplinary decision, it would still survive scrutiny. The majority in Horowitz stated that a disciplinary decision to expel a student only "required an informal give-and-take between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context." Horowitz , 435 U.S. at 85-86, 98 S.Ct. 948 (internal quotation marks omitted) (citing Goss v. Lopez , 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) ). Plaintiff clearly had that opportunity via a meeting at which his cousin was present, and the opportunity to file an appeal in which he explained his conduct.